# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

DANIJELA P.,

        *Plaintiff,*             Case No. 23-cv-10432

*v.*                          Patricia T. Morris
                               United States Magistrate Judge

COMMISSIONER OF
SOCIAL SECURITY,

        *Defendant.*

_____/

## ORDER AND OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 8, 9)

## I.  RECOMMENDATION

For the reasons set forth below, Plaintiff Danijela P.'s Motion for Summary Judgment is **DENIED** (ECF No. 8), Defendant's Motion for Summary Judgment is **GRANTED** (ECF No. 9), and the Commissioner's final decision is **AFFIRMED**.

## II.  REPORT

### A.  Introduction and Procedural History

Plaintiff's application for Disability Insurance Benefits was filed on December 27, 2019. (ECF No. 4-1, PageID.114, 116). Plaintiff alleges her disability condition began on November 1, 2019. (*Id.* at PageID.116). The Commissioner denied these claims initially on January 13, 2021, and upon reconsideration on

March 30, 2021. (*Id.* at PageID.113, 130, 154). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which took place on November 19, 2021. (*Id.* at PageID.158, 165). The ALJ issued a decision on January 18, 2022, finding that Plaintiff was not disabled. (*Id.* at PageID.44). The Appeals Council denied review on December 23, 2022. (ECF No. 4-1, PageID.15). Plaintiff sought judicial review on February 21, 2023. (ECF No. 1). Both parties consented to the undersigned, magistrate judge, "conducting any or all proceedings in this case, including entry of a final judgment on all post-judgment matters." (ECF No. 6, PageID.697). The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 8, 9).

### B. Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

## C.  Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

3

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 4-1, PageID.30).

At step one, the ALJ found Plaintiff met the insured status requirements through December 31, 2025. (*Id.* at PageID.31). And while Plaintiff had worked after the alleged disability onset date, the work activity did not rise to the level of substantial gainful activity. (*Id.*). At step two, the ALJ concluded that Plaintiff's severe impairments comprise of the following: multiple sclerosis ("MS"), occipital neurologia, neurocognitive decline secondary to post-concussion syndrome, depression, and vitamin B12 deficiency. (*Id.*). The ALJ also considered Plaintiff's reported impairments of occipital neuralgia and thoracic paraspinal muscle spasms, and found they were not severe. (*Id.* at PageID.32). The impairments, either independently or collectively, did not meet or medically equal a listed impairment.

(*Id.*).  Next, before proceeding to step four, the ALJ found Plaintiff had the residual

functional capacity ("RFC") to perform

> Light work as defined in 20 CFR 404.1567(b) except she
> can never climb ladders, ropes, or scaffolds, but can
> occasionally perform all other postural activities.  She can
> frequently handle, finger, and feel with her dominant right
> hand.  She can frequently operate foot pedals on the right.
> She must avoid hazards such as heights and the operation
> of heavy machinery.  She can perform tasks that are simple
> and repetitive.  She should not work with the general
> public, and is limited to occasional interaction with
> supervisors and coworkers.

(*Id.* at PageID.35).  At step four, the ALJ found that Plaintiff could not perform past

relevant work.  (*Id.* at PageID.43).  Finally, at step five, the ALJ determined that

Plaintiff could perform a significant number of jobs in the economy, which included

garment sorter, nuts and bolts assembler, and housekeeper.  (*Id.* at PageID.43–44).

Accordingly, Plaintiff was found not to be disabled.  (*Id.* at PageID.44–45).

### E.  Administrative Record

#### 1.  Overview of Medical Evidence

Plaintiff has a well-documented medical history and the record provides a

comprehensive snapshot of the ailments and symptoms she experienced during the

relevant time period.  As a reminder, Plaintiff alleges her disability condition began

on November 1, 2019.  (*Id.* at PageID.116).

### a. Michigan Institute of Neurological Disorders ("MIND") – Dr. Bradley Aymen, D.O.

In November 2018, Plaintiff underwent an MRI which disclosed the presence of several cortical and subcortical lesions on the posterior fossa[1] structures. (*Id.* at PageID.369). The overall impression noted the presence of multiple demyelinating plaques[2] with no significant interval change since the prior study, and the absence of any enhancing lesions. (*Id.* at PageID.370).

In March 2019, the MIND progress note reflected Plaintiff's November 2018 brain and cervical spine MRI which "revealed stable nonenhancing MS with no new lesions." (*Id.* at PageID.362). Further, the MIND notes indicate Plaintiff denied experiencing "new or worsening symptoms." (*Id.*).

In September 2019, Plaintiff presented to Dr. Aymen to complain of numbness and tingling in her hands and worsening balance despite not having

---

[1] The posterior fossa is a small space in the skull, found near the brainstem and cerebellum. The cerebellum is the part of the brain responsible for balance and coordinated movements. The brainstem is responsible for controlling vital body functions, such as breathing. *Posterior Fossa Tumor*, Mount Sinai (Dec. 1, 2023), https://www.mountsinai.org/health-library/diseases-conditions/posterior-fossa-tumor.

[2] Demyelinating diseases are those that lead to a loss of myelin, the sheaths of fatty tissue that surround and protect nerves so that they can send signals efficiently. A loss of myelin can cause neurological deficits, such as vision changes, weakness, altered sensation, and behavioral or cognitive (thinking) problems. Heidi Moawad, *Demyelination and Demyelinating Disease*, Verywell Health, May 18, 2023, https://www.verywellhealth.com/demyelination-4691934. Plaques, sometimes referred to as lesions, form where myelin is under attack by the immune system. *Demyelination: What Is It and Why Does It Happen*, Healthline, May 1, 2019, https://www.healthline.com/health/multiple-sclerosis/demyelination#causes.

experienced any recent falls. (*Id.* at PageID.347). She also complained of fleeting, but daily, headaches. (*Id.*). During that month, she also underwent an MRI, the results of which were compared to the November 2018 results. (*Id.* at PageID.352). The September 2019 MRIs showed the "cervical spine was stable to many lesions, no active enhancement or new lesions." (*Id.* at PageID.347). The brain MRI was also "stable in terms of lesions, [with] no new lesions or enhancing lesions [ ] identified." (*Id.* at PageID.347). The impression was Plaintiff had stable, nonenhancing multiple sclerosis and no new lesions were identified. (*Id.* at PageID.352).

In November 2019, Plaintiff underwent Nerve Conduction Velocity ("NCV") and Electromyography ("EMG") testing, the results of which were all within normal limits. (*Id.* at PageID.342). Further, all examined muscles showed no evidence of electrical instability. (*Id.*). The overall impression was the test resulted in a "[n]ormal electrodiagnostic study of the right upper limb and the left upper limb." (*Id.*). And there was no electrodiagnostic evidence of carpal tunnel syndrome nerve entrapment. (*Id.*).

In February 2020, Dr. Aymen's progress notes reflect Plaintiff's complaint of bilateral feet numbness and difficulty controlling her legs. (*Id.* at PageID.338). She explained the symptoms began in November and comprise of complete numbness in her feet and the ability to only sense pressure. (*Id.* at PageID.338). As a result,

8

Plaintiff had difficulty going up the stairs because she would suddenly, and unintentionally, go up two steps instead of one. (*Id.*). She had experienced at least one minor fall due to these symptoms but denies any head trauma or loss of consciousness. (*Id.*). She also complained of worsening memory and difficulty concentrating, but denied leaving the stove on, water running, or getting lost in familiar areas. (*Id.*). She reported experiencing occasional headaches "radiating around her eyes" which generally resolved within 10-15 minutes after applying pressure and rest. (*Id.*). The notes also discuss an earlier MRI of the cervical spine which "revealed additional T2 signal abnormalities, largest at the C4 level, with additional lesions at the C2-C3 level, and possibly in the upper thoracic spine." (*Id.* at PageID.339).

During the same month, she underwent another MRI, the results of which were compared to her September 2019 MRI. (*Id.* at PageID.336). The results presented the following findings:

> Multiple demyelinating lesions within the posterior fossa are stable. Demyelinating lesions are also seen extending along the optic radiations, within the periventricular, pericallosal, and juxta cortical distribution and overall appears stable from prior. No new lesions are identified. No abnormal gradient signal lesions are identified.
>
> Thoracic vertebrae maintain normal height, alignment and marrow signal intensity. Previously described demyelinating lesions at T1-T2 is less pronounced on today's examination. There are no new lesions identified and no postcontrast enhancement is seen.

(*Id.* at PageID.336–37).

In March 2020, Plaintiff underwent NCV and EMG testing, the results of which were all within normal limits, and all examined muscles showed no evidence of electrical instability.  (*Id.* at PageID.331).  The overall impression was "[n]ormal electrodiagnostic study of both lower limbs" and no electrodiagnostic evidence of left lumbar radiculopathy or generalized peripheral neuropathy.  (*Id.*).  Plaintiff's June 2020 and September 2020   MIND progress notes do not reflect any notable medical developments.  (*Id.* at PageID.401, 472).

In November 2020, Plaintiff underwent an MRI and the final report findings reflected "[m]ulitple demyelinating lesions are seen in the cerebellar hemispheres as well as demyelinating plaques in the periventricular, pericallosal and juxta cortical distribution" but there were no new lesions identified.  (*Id.* at PageID.557).  The final impression was "[s]table nonenhancing demyelinating lesions."  (*Id.* at PageID.557, 672).  The progress notes reflect the same findings.  (*Id.* at PageID.558).

In January 2021, Plaintiff appeared before Dr. Aymen complaining that her memory had worsened and her balance continued to feel off although she had not suffered any falls since her previous appointment.  (*Id.* at PageID.552).  Her physical examination was within the normal range.  (*Id.* at PageID.555).  In April 2021, her treatment notes do not reflect complaints regarding new or worsening symptoms and

10

her physical examination results were within the normal range.  (*Id.* at PageID.663–65).

In May 2021, Plaintiff underwent an MRI the results of which noted "[a]dditional lesions [on] cortex and posterior fossa structures" and "[s]everal lesions [ ] [identified] within the corpus callosum."  (*Id.* at PageID.662).  The impression noted there were no enhancing lesions.  (*Id.*).

In September 2021, Plaintiff presented before Dr. Aymen.  (*Id.* at PageID.650).  Her physical examination results remained within the normal ranges and her MS appeared to be stable.  (*Id.* at PageID.652–54).  Dr. Aymen did not make any changes to her treatment plan.  (*Id.*).

### b. Ascension Eastwood Behavioral Health

Plaintiff's April 2020 Intake Assessment Form notes the precipitant for her issues as a concussion resulting from an assault visited upon her by her husband in June 2014, along with her husband's continuing infidelity and mental and physical abuse.  (*Id.* at PageID.378).  The assessment identifies the following pertinent presenting problems and symptoms as:

- Multiple Sclerosis;

- Bruises on the brain which was "cause of loss of consciousness, multiple trauma to the head;"

- Loss of memory and loss of balance;

11

- Depression, crying spells, sense of hopelessness, fear, and anxiety accompanied by racing thoughts;

(*Id.* at PageID.378–80).

## 2. Medical Source Statements and Reports

### a. Dr. Bradley Aymen, DO (February 26, 2020)

Dr. Aymen's Medical Source Statement ("MSS") identified Plaintiff's diagnoses as MS and post-concussion syndrome, and her symptoms as paresthesias, memory and cognitive complaints. (*Id.* at PageID.325). Dr. Aymen identifies Plaintiff's clinical findings and objective signs are listed as sensory loss in extremities and balance disturbance. (*Id.* at PageID.325–26). Dr. Aymen noted Plaintiff would be off task 25% or more during a workday. (*Id.* at PageID.326).

According to Dr. Aymen, Plaintiff would only be able to (i) walk two to four city blocks, (ii) sit for no more than one hour, (iii) sit for a total of four hours in a workday, (iv) stand for no more than 30 minutes, and (v) stand or walk for less than two hours in a workday. (*Id.* at PageID.327). Further, Plaintiff would need to include a five-minute walking period every hour. (*Id.* at PageID.327). She would also need to shift positions, at will, from sitting, standing, or walking, and take unscheduled breaks during an 8-hour workday. (*Id.* at PageID.327). The unscheduled breaks would need to occur every 4 hours, and last for about 15

minutes. (*Id.* at PageID.327). Plaintiff would not need the use of a cane or any other assistive device when standing or walking. (*Id.* at PageID.327).

Plaintiff can carry less than ten pounds continuously, ten pounds frequently, and 20 pounds occasionally. (*Id.* at PageID.327). She can frequently look up and down, turn her head right or left, hold her head in static position, and twists, and occasionally stoop, crouch/squat, climb ladders, and stairs. (*Id.* at PageID.327–28). She has significant limitations with reaching in both hands, fingers, and arms. (*Id.* at PageID.328). Last, as a result of her impairments, Plaintiff is likely to be absent from work more than four days per month. (*Id.* at PageID.328).

### b. Dr. Ray Kamoo, PhD, LP (December 27, 2021)

Dr. Kamoo conducted a neuropsychological evaluation of Plaintiff on November 30 and December 10, 2021. (*Id.* at PageID.687).

In May 2021, Plaintiff stopped working in her role as a dispatcher at Gemini Transport as she realized she was no longer able to keep up with several of her job responsibilities. (*Id.* at PageID.687). These cognitive difficulties also affected her ability to cook, grocery shop unaccompanied, honor her appointments, and recall the information she has communicated to others. (*Id.* at PageID.687–88). While she remains independent when it comes to self-care tasks, she experiences challenges while executing them (e.g., she has showered fully clothed) and she experiences poor sleep. (*Id.* at PageID.688).

13

During her evaluation, Plaintiff completed several tests and the pertinent results are as follows:

Attention/Concentration/Processing

On tasks of simple verbal and visual attention, Plaintiff was able to perform within the Mildly Impaired range; which was within the expected level of performance. On tasks of sustained attention to visual tasks, her performance fell in the Moderately Impaired range and was mildly impaired compared to the expected level of performance, showing she had difficulty sustaining attention to task.

Due to this distractibility for sustained attention tasks she may appear forgetful simply because she had difficulty attending to the information in the first place. For more complex attention and mental flexibility tasks that combine both visual and verbal attention, her performance was in the Mildly Impaired and was within the expected level of performance.

Language

Her performance on language comprehension-based tasks fell in the Mildly Impaired range which was within the expected level of performance.

Reasoning and Problem Solving

Her verbal problem-solving abilities were within the Mild to Moderately Impaired range. On visual problem solving her scores were in the Below Average range and within the expected level of performance. Due to attentional difficulties, problems with consistently meeting daily responsibilities are often reported. When compared to her expected level of performance on this skill, she scored within the expected level of performance.

She may have difficulties scheduling activities and understanding instructions and may be inconsistent in meeting daily responsibilities. She had difficulty adjusting to changing situations.   She will have some difficulty making decisions.

Memory and New Learning

Her performance on general memory function, both visual and verbal memory, fell in the Mildly Impaired range. The amount of verbal information she was able to absorb with only one trial was within the expected level of performance.  She had difficulty benefiting from multiple repetitions or trials for verbally learning new information and will likely need more time to learn new material and will be slower in gaining new skills.  Her score was mildly impaired compared to the expected level of performance.

The amount of short-term verbal information recalled based on the amount of information learned was Mildly Impaired.  Her recall of information after a short delay was impaired, indicating forgetfulness is likely to be a problem in daily functioning.   Once information is learned, it is retained adequately.

The amount of long-term verbal information recalled based on the amount of information learned was Below Average, suggesting difficulties with transitioning verbal information into more long-term memory and learning.

Her recall of simple verbal memory items was Moderately Impaired.  When given tasks of delayed verbal recall, her performance was Below Average and within the expected level of performance.

When examining the non-obvious verbal memory tasks, that is, tasks that require memory performance to do the task, but are not identified as obvious memory tasks, her performance showed a score in the Below Average

range. These tasks assess more "functional" memory ability.

She showed a consolidation memory error pattern which indicates a slower learning of verbal information. She may require more time to learn new verbal information, and will need more repetitions, cues and reminders will be helpful. Her initial uptake of visual information fell in the Mild to Moderately Impaired range and was within the expected level of performance.

After a delay or distraction from the task, her recall of visual information was within the expected level of performance. Given the amount of visual information initially perceived, the amount of information retained over the short-term was Below Average. The amount of visual information that was retained from the short-term recall to the long-term recall, 30 minutes, was Above Average.

Visual Perception

She showed Mild to Moderately Impaired visual perceptual ability. Her speed and accuracy for visual scanning was Below Average, and within the expected level of performance. Her perception of lines and angles was also Below Average.

Motor

Her abilities for fine motor tasks, including those that require fine motor speed and persistence, was Mild to Moderately Impaired. Her non-dominant hand motor and sensory abilities were within the Average range. Psychological factors affecting behavior may also affect attention and concentration. This pattern of scores indicates she has difficulty maintaining attention and concentration to tasks.

Emotional

16

> She may have difficulty controlling emotions and emotions may be closer to the surface. She was somewhat impulsive in decision making. Social interaction difficulties are also possible and moodiness may be noted. She may be somewhat slow in performing tasks. Rumination and worry and difficulty adapting to changing situations, particularly when there is an emotionally charged situation, are also noted.

(*Id.* at PageID.690–93).

### c. Dr. Robin Mika's Report (Physical Residual Functional Capacity)

Dr. Robin Mika found that one, or more, of Plaintiff's medically determinable impairments could reasonably be expected to produce her pain or other symptoms, however, her statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone. (*Id.* at PageID.100). Dr. Mika found Plaintiff's statements regarding her symptoms, considering the total medical and non-medical evidence in the file, to be partially consistent. (*Id.* at PageID.101).

Dr. Mika found that Plaintiff could (i) occasionally lift and/or carry up to 10 pounds, (ii) frequently lift and/or carry 10 pounds, (iii) stand and/or walk for about six hours in an 8-hour workday, and (iv) sit for about 6 hours in an 8-hour workday. (*Id.* at PageID.103). Her ability to push and/or pull (including operation of hand and/or foot controls) is limited in both upper extremities. (*Id.*). Further, Plaintiff had the following postural limitations: (i) occasional climbing ramps/stairs, (ii)

17

never climbing ladders/ropes/scaffolds, (iii) occasional balancing, (iv) frequent stooping, (iv) frequent kneeling, (v) occasional crouching, and (vi) occasional crawling. (*Id.* at PageID.103–04). Plaintiff also has manipulative limitations which comprise of: (i) limited overhead reaching (both left and right); (ii) limited handling (both); (iii) limited fingering (both); and (iv) limited feeling (both). (*Id.* at PageID.104). Plaintiff would also need to avoid concentrated exposure to wetness, any exposure to vibration, and avoid moderate exposure to hazards. limited to exposure to wetness. (*Id.* at PageID.105).

In sum, Dr. Mika limited Plaintiff to a sedentary level of lifting and carrying, and extensive laminations regarding the use of her upper extremities. (*Id.* at PageID.111). At the reconsideration level, Dr. Myung Ho Hahn found Plaintiff (i) did not need limitations as to her upper extremities, (ii) could occasionally climb ramps or stairs, balance, stoop, kneeling, crouch, and crawl, (iii) could never climb ladders, ropes, or scaffolds  reconsidered, (iv) should avoid concentrated exposure to vibration, and (v) avoid all exposure to hazards. (*Id.* at PageID.122–24). Dr. Mika's opinion, and found that the overall medical evidence in the file supported Plaintiff's ability to engage in light ranged work activity. (*Id.* at PageID.124).

### d.  Dr. Anthony Gensterblum
### (Mental Residual Functional Capacity)

Dr. Anthony Gensterblum found Plaintiff was not significantly limited to remembering locations and work-like procedures or understanding and

remembering very short and simple instructions, but was moderately limited in the context of understanding and remembering detailed instructions. (*Id.* at PageID.106–07). Plaintiff is not significantly limited in the ability to carry out very short and simple instructions, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, or make simple work-related decisions. (*Id.* at PageID.107). But is moderately limited in (i) carrying out detailed instructions, (ii) maintaining attention and concentration for extended periods, (iii) her ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances, and (iv) her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at PageID.107–08). Plaintiff is moderately limited in her ability to interact appropriately with the general public. (*Id.* at PageID.108). But is not significantly limited in her ability to (i) ask simple questions or request assistance, (ii) accept instructions and response appropriately to criticism from supervisors, (iii) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and (iv) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.* at PageID.108–09). Plaintiff is moderately limited in her ability to respond appropriately to changes in the work setting and set realist goals or make

plans independently of others. (*Id.* at PageID.109–10). But is not significantly limited in her ability to be aware of normal hazards and take appropriate precautions, and to travel in unfamiliar places or use public transportation. (*Id.* at PageID.109). Dr. William Norton adopted this opinion at the reconsideration level. (*Id.* at PageID.116–21).

### 3. Application Reports and Administrative Hearing

#### a. Plaintiff's Function Reports

##### i. April 21, 2020 Report

In her Function Report, Plaintiff states that before her illness she was able to keep track of her tasks and had the energy and strength to complete them. (*Id.* at PageID.256).

Since the development of her illness, she has lost feeling in her hands, which resulted in an inability to complete her work tasks including typing on a computer, and  experiences leg and arm spasms throughout the night, which prevents her from sleeping. (*Id.* at PageID.255–56). Since the development of her illness she has experienced memory loss, "along with other post-concussion syndrome," and is now restricted to the role of dispatcher. (*Id.* at PageID.255). In regard to personal care, she is unable to button her attire, blow-dry her hair, cut her food, or iron as she can no longer stand or use her hands in a precise fashion. (*Id.* at PageID.256–57). While she is still able to drive and ride in a vehicle, she cannot go out on her own because

once arriving at her destination, she will often forget her reasons for traveling. (*Id.* at PageID.258). She is able to bathe herself, shave, and use the restroom. (*Id.* at PageID.256). She shops online approximately once a month, is able to pay bills, manage a savings account, and use a checkbook. (*Id.* at PageID.258). However, she is unable to count change. (*Id.* at PageID.258).

She can only walk for about thirty minutes before needing to rest, has no issues following written instructions, and is able to follow oral instructions moderately well but admits that she tends to forget some steps. (*Id.* at PageID.260). She does not handle stress or change in her routine very well. (*Id.* at PageID.261). She also noted that she's noticed an unusual increase in becoming emotional and frequency of crying. (*Id.* at PageID.261).

In regard to her social capabilities, she no longer spends time with others. (*Id.* at PageID.259). And when she does spend time with her family, she reports getting into disagreements with them about everyday matters. (*Id.* at PageID.260). However, she has no issues getting along with authority figures. (*Id.* at PageID.261).

Her daily routine entails of completing her hygiene routine, taking her medication, preparing meals, assisting her daughters in preparing for school, transporting her daughters from school, and working. (*Id.* at PageID.256–57). She uses reminders and post-it's to remember to take her medication and transport her

daughters from school.  (*Id.*).  She also cares for a pet (i.e., feed and bathes it), cleans, does laundry, and gardens.  (*Id.*).

### ii.  February 27, 2021 Report

In her February 27, 2021 Function Report, Plaintiff expands on the representations made in her initial report.  She states that prior to the development of her illness she was able to cook, clean, recall appointments, and assist her daughters with school.  (*Id.* at PageID.285).

Overall, her illness affects her ability lifting, bending, walking, sitting, remembering, completing tasks, concentrating, understanding, following instructions, and using her hands.  (*Id.* at PageID.289).  She is able to follow written instructions but faces difficulty following spoken instructions.  (*Id.* at PageID.289).  She explains that she now loses her balance while bending or walking, and her memory deterioration has made other tasks more difficult.  (*Id.* at PageID.289).  And she is only able to walk for about fifteen or twenty-five minutes before needing to rest.  (*Id.* at PageID.289).

Since the development of her illness, she is no longer able to remember daily chores, take her medication, pay bills, or attend her appointments.  (*Id.* at PageID.284).  In regard to personal care, she is unable to blow-dry or style her hair, and her daughter must constantly remind her to address her personal needs and grooming.  (*Id.* at PageID.285, 286).  She is still unable to iron because she burns

the clothes. (*Id.* at PageID.286). She continues to care for others by doing laundry and cooking for them, and cares for her dog. (*Id.* at PageID.285). While she does prepare meals she will, at times, forget something is on the stove and the food will burn so her daughter does most of the cooking. (*Id.* at PageID.286).

She also no longer goes out alone as she will forget why she went to a certain location. (*Id.* at PageID.287). And when she does go out, she is usually riding in, and not driving, the car. (*Id.*). She is now able to count change but is no longer able to pay bills, manage a savings account, or use a checkbook unlike before. (*Id.* at PageID.287).

She does not engage in many social interactions and when she engages with her family, they typically get annoyed with her for constantly having to remind her to do things. (*Id.* at PageID.288).

### 4. Plaintiff's Testimony

Plaintiff testified that she completed "some college, cosmetology." (*Id.* at PageID.56). Plaintiff worked as a dispatcher at Gemini Transport Trucking Company until November 2019 when she decreased her hours from 40 hours per week to ten due to her health. (*Id.* at PageID.56–57). In her capacity as a dispatcher, she would connect with drivers, collect paperwork from them, answer phone calls, make computer entries involving "loads, time, [and] location." (*Id.* at PageID.57). Over the course of her workday, she would alternate between sitting and standing

23

equally and carried up to about 15 pounds. (*Id.* at PageID.58–59).  She started doing this work in 2005 and stopped working entirely in May or June of 2021.  (*Id.* at PageID.56, 57).  She stopped working as the frequency of her mistakes began to increase (e.g., forgetting to collect paperwork, making incorrect computer entries, etc.).  (*Id.* at PageID.57–58).  Since then, she has not searched for any new work.  (*Id.* at PageID.59).

Since quitting her job as a dispatcher, Plaintiff spends most of her days at home, and when she does leave the house, she is typically accompanied by someone else (e.g., only goes grocery shopping with her daughter) due to her forgetfulness/memory.  (*Id.* at PageID.60).  Due to her memory issues: (i) although, she still has her driver's license, she will avoid driving; (ii) she tries to cook quick meals but does not do this often as she is too forgetful; and (iii) while she does not have issues bathing herself, within the past three months prior to the hearing, she became so forgetful to the point where she would bathe fully clothed.  (*Id.* at PageID.59, 72–73, 74).  When she is home, either her husband or her daughters will assist her with carrying and unpacking groceries, as she can only carry between five to six pounds (*Id.* at PageID.61, 73).

Plaintiff was diagnosed with MS in 2019 and received a handicap parking placard from her neurologist.  (*Id.* at PageID.66–67).  Plaintiff attributes her lack of activity to (i) lack of feeling on her right side, hand and leg; (ii) difficulty balancing;

(iii) back pain; (iv) daily mild to severe headaches; and (v) multiple sclerosis ("MS"). (*Id.* at PageID.59, 63, 65, 76). For her balancing issues, she has never used an ambulatory device. (*Id.* at PageID.66). She began experiencing these severe headaches in 2019 as the result of a head injury, and rates her headaches averaging between a five and a ten on a 10-point pain scale. (*Id.* at PageID.63, 64). To alleviate her headache, she will take an Excedrin and lie down for about an hour. (*Id.* at PageID.64). She can only stand for about 15 minutes at a time, sit with her feet on the floor for about 15 or 20 minutes, and has to lay down for about an hour or two between two to three times over the course of a day. (*Id.* at PageID.59, 60, 62). Plaintiff also has issues falling and staying asleep. (*Id.* at PageID.68). On average, she sleeps for a total of approximately two hours a night. (*Id.* at PageID.68). She is currently taking Vumerity, hormones for menopause, and Excedrin. (*Id.* at PageID.69–71).

She experiences bouts of crying spells, is irritable with others, easily angered, and has difficulty concentrating. (*Id.* at PageID.68–71). Plaintiff stopped undergoing mental health therapy treatments after November 2020 because they began to make her feel worse. (*Id.* at PageID.67). She would become stressed out, which would result in an MS flare up. (*Id.*). At the end of her therapy treatment, her therapist referred her for speech therapy to help improve her memory, but she did not go due to COVID. (*Id.* at PageID.67).

25

### 5.  The Vocational Expert's ("VE") Testimony

Cheryl Mosley, vocational expert ("VE"), testified during the administrative hearing.  (ECF No. 4-1, PageID.79).  The VE classified Plaintiff's previous work experience as that of a Motor Vehicle Dispatcher, Dictionary of Occupational Titles ("DOT") 249.167-014, SVP of 5 which is skilled, physical demand per DOT sedentary, and performed as light per Plaintiff's testimony.  (*Id.* at PageID.80).

The ALJ then inquired about a hypothetical person of Plaintiff's age, education, and past relevant work experience with the following limitations:

> Assume that such a person is limited to light work and cannot climb ladders, ropes or scaffolds, and can only occasionally perform other postural activities.  Such a person can only frequently handle, finger and feel with the right-dominant hand, and can frequently operate foot pedals with the right-dominant hand, and can frequently operate foot pedals on the right.  Such a person should avoid hazards including heights, heavy machinery and walking on uneven surfaces.  Such a person is limited to the performance of simple, repetitive tasks, and such a person should not have to interact more than occasionally with coworkers and supervisors, and should never have to interact with the general public.

(*Id.* at PageID.80).  The VE testified that such a person would not be able to perform Plaintiff's past relevant work as generally performed or as performed by Plaintiff.  (*Id.*).  The VE identified the following jobs, under the light category of work, as those capable of being performed by such as individual: garment sorter (*DOT* 22.687-014, SVP 2, 200,000 jobs nationally), nut and bolt assembler (*DOT* 929.587-

010, SVP 2, 400,000 jobs nationally), and housekeeping (*DOT* 323.687-014, SVP 2, 800,000 jobs nationally).  (*Id.* at PageID.81).

The ALJ then asked what jobs would be available to the hypothetical individual if they were further limited to a range of sedentary work, could only occasionally push and pull with their arms, and should avoid wetness.  (*Id.*).  The VE testified that under the sedentary category, the following positions were available: nut sorter (*DOT* 521.687-086, SVP 2, 450,000 jobs nationally), final assembler (*DOT* 713.687-018, SVP 2, 200,000 jobs nationally), and trimmer (*DOT* 734.687-094, SVP 2, 450,000 jobs nationally).  (*Id.*).

The ALJ further limited the hypothetical individual to only occasionally handling, fingering and feeling with the right-dominant hand.  (*Id.*).  The VE testified that with these restrictions, the nut sorter and final assembler positions would still remain as viable options, but the numbers would be reduced in half.  (*Id.* at PageID.82).  The ALJ included an additional limitation which would require the hypothetical individual to lie down, in excess of an hour and a half, throughout the day due to headaches and other symptoms.  (*Id.*).  The VE testified this lie down requirement would "work preclusive to all employment at all exertional level," including the jobs identified in her testimony.  (*Id.*).

The VE stated that her testimony was in line with the DOT except for her testimony relating to (i) the use of Plaintiff's hands, differentiating between the right

dominant and the use of the other hand, (ii) contact with coworkers, supervisors, and the public, and (iii) the lie down requirement.  (*Id.*).  This portion of her testimony was based on her decades of job placement experience.  (*Id.*).

## F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources.  An acceptable medical source means a medical source who is a:

(1)   Licensed physician (medical or osteopathic doctor);

(2)   Licensed Psychologist, which includes:

    (i)   A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)   Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)   Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist

practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early

intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical

sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative

medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."   These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding."   *Id.*, § 404.1520c(c)(5).   "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."   *Id.*   Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive."   *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."   The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record."   *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she]

considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

> (i)    Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

> (ii)   Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

> (iii)  Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels []

instead of descriptions about your functional abilities and limitations[];

(iv)   Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)   Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504.  Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits."  *Id.*  The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]"  *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both."  *Id.*, § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)."  *Id.*  Further, "[s]igns must be shown by

medically acceptable clinical diagnostic techniques.  Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated."  *Id.*, § 404.1502(g).  Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests."  *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]"  *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective

medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms

(e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.*   The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Id.*

38

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a).  Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)   The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)   The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

## G.  Arguments and Analysis

Overall, Plaintiff raises three challenges to the ALJ's decision.  First, she contends that "by a preponderance of the medical evidence of record, she medically

equals Listing 11.09B" and the ALJ's evaluation concluding her multiple sclerosis impairment did not meet and/or medically equal Listing 11.09(B) was flawed.  (ECF No. 8, PageID.713).   Second, she argues the ALJ made an erroneous RFC assessment in finding her capable of a reduced light level exertion when the evidence demonstrates she is not capable of "even a reduced range of sedentary level of exertion on a regular and sustained basis."  (*Id.* at PageID.718).  The error is further underscored by the ALJ's failure to include a sit/stand option and limitations for use of the bilateral upper extremities.  (*Id.*).  Third, the ALJ's mental RFC assessment did not appropriately reflect Plaintiff's severe cognitive issues secondary to her MS, post-concussive syndrome, depression, and anxiety.  (*Id.* at PageID.720).  The Commissioner counters that Plaintiff's MS impairment, regardless of severity, does not satisfy the criteria to find that it meets or medically equals Listing 11.09, and that substantial evidence supports the physical and mental limitations included in the RFC.  (ECF No. 9, PageID.730–33, 738).

After reviewing the parties' respective summary judgment motions, the Court finds that the (i) ALJ's determination that Plaintiff's condition does not meet or medically equal Listing 11.09(B), and (ii) physical and mental limitations included in the RFC are all supported by substantial evidence.

      **a.  The ALJ's Finding that Plaintiff's Impairment Does Not Meet the Requirements for Listing 11.09 is Supported by Substantial Evidence**

In sum, Plaintiff argues that the ALJ's decision relied upon the objective medical record to find that her impairment did not meet or medically equally Listing 11.09, and failed to give the appropriate consideration to her increased symptomology (e.g., imbalance, intermittent blurred vision, short-term memory, numbness/tingling in her right hand up to the wrist, and recurrent headaches). (ECF No. 8, PageID.715). In support of her position, she cites to medical records listing her symptoms, Dr. Aymen's opinion, and Dr. Kamoo's report.[3] (*Id.* at PageID.713–17). The ALJ's decision demonstrates that, although she did not arrive at a conclusion beneficial to Plaintiff, she indeed reviewed and considered Plaintiff's entire medical record, including Plaintiff's symptomology, and afforded the appropriate amount of deference to the various categories of information contained within, before determining that Plaintiff does not meet Listing 11.09.

To satisfy Listing 11.09, a claimant must have multiple sclerosis either (A) characterized by a "disorganization of motor function in two extremities . . . resulting in an extreme limitation . . . in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities;" or (B) with marked

---

[3] Plaintiff argues that her medical records along with Drs. Aymen and Kamoo's respective reports "show that by a preponderance of the evidence" her MS could meet or equal Listing 11.09. But that is not the appropriate standard of review. Even if substantial evidence supports the conclusion opposite from the ALJ's findings—and even if a reviewing court finds that opposite conclusion to be supported by a preponderance of the evidence—this is not sufficient to reverse the ALJ's decision. *Cutlip*, 25 F.3d at 286. Plaintiff must demonstrate that the ALJ's ruling was not supported by substantial evidence. *Id.*

limitations in physical functioning and in one area of mental functioning.[4]  20 C.F.R.

pt. 404, Subpt. P, App. 1 § 11.09.  A marked limitation means that

> . . . due to the signs and symptoms of [a claimant's] neurological disorder, [a claimant is] seriously limited in the ability to independently initiate, sustain, and complete work-related physical activities.  [A claimant] may have a marked limitation in . . . physical functioning when [their] neurological disease process causes persistent or intermittent symptoms that affect [their] abilities to independently initiate, sustain, and complete work-related activities, such as standing, balancing, walking, using both upper extremities for fine and gross movements, or results in limitations in using one upper and one lower extremity. The persistent and intermittent symptoms must result in a serious limitation in [their] ability to do a task or activity on a sustained basis.  We do not define "marked" by a specific number of different physical activities or tasks that demonstrate [a claimant's] ability, but by the overall effects of [the claimant's] neurological symptoms on [their] ability to perform such physical activities on a consistent and sustained basis.  [A claimant] need not be totally precluded from performing a function or activity to have a marked limitation, as long as the degree of limitation seriously limits [a claimant's] ability to independently initiate, sustain, and complete work-related physical activities.

---

[4] Listing 11.09(B) requires a marked limitation in physical functioning, and in one of the following: (1) understanding, remembering, or applying information; or (2) interacting with others; or (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 11.00(G)(2). The claimant is required to show that her impairment meets all of the specified medical criteria, not merely some. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

The ALJ reviewed the record and found that the medical evidence did not "document listing-level severity, and no acceptable medical source ha[d] noted findings equivalent in severity to the criteria of any listed impairment, individually or in combination." (ECF No. 4-1, PageID.32). She explained that

> The claimant's most recent neurological treatment notes (through September 2021) indicate the claimant has reported some worsening balance difficulties with numbness and tingling to both feet, as well as numbness and tingling in her right hand to her wrist, with ongoing short term memory issues. However, on physical examination, the claimant had an unremarkable gait and station; normal muscle bulk, tone, and strength in her bilateral upper and lower extremities; and intact sensation in her bilateral upper and lower extremities. The claimant also had normal cranial nerving functioning and normal reflexes. In fact, there were no abnormal findings noted on examination, and the neurologist noted that the most recent MRI examinations of the claimant's brain and thoracic spine were stable, without new lesions. The claimant was diagnosed with stable MS.

(*Id.*) (internal citations omitted).

First, I will address Listing 11.09(A). As expressed in the ALJ's decision, the record is devoid of evidence demonstrating that Plaintiff has disorganization in motor function in two extremities resulting in extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper

43

extremities, which Plaintiff appears to concede as her brief focuses on 11.09(B). (ECF No. 8, PageID.713).

As to Listing 11.09(B), the record does not support Plaintiff's contention that she satisfies the requirements for this subpart as it does not demonstrate that Plaintiff has a marked limitation in her physical functioning. (ECF No. 4-1, PageID.33). In concluding that substantial evidence exists in the record to support the ALJ's finding, we need look no further than Plaintiff's treatment notes and her own function reports. As discussed above, her treatment notes consistently demonstrate stable musculoskeletal and neurological examinations as highlighted by the ALJ. (*Id.* at PageID.32, 342, 336, 401, 472, 557, 672). Further, the treatment notes show a normal and steady gait, full strength in her extremities, no new lesions, and no references to flare ups. (*Id.*). Plaintiff's only argument as to the ALJ's analysis and ultimate decision is it failed to give full credence to her subjective complaints. But this carries very little weight as the ALJ cited specifically to a lack of objective medical evidence to support Plaintiff's subjective complaints regarding her worsening symptoms. *Stouffer v. Astrue*, No. 02:11-cv-00096, 2012 WL 399727, at *7 (W.D. Pa. Feb. 7, 2012) (The ALJ appropriately rejected plaintiff's subjective complaints of pain and limitation by reference to plaintiff's long-time treating physician.); *Jasmine L. v. Comm'r of Soc. Sec.*, No. 20-14543, 2022 WL 214547, at **9–10 (D.N.J. Jan. 25, 2022) (The ALJ "appropriately considered Plaintiff's

subjective pain and symptoms, in conjunction with the substantial medical record evidence, and provided reasons for rejecting the extent of Plaintiff's complaints about her symptoms.").

Further, although Plaintiff stopped working in 2019, her April 2020 function report shows that she remained fairly active on a daily basis. (*Id.* at PageID.256). She reported being able to drive herself around, perform her personal care independently, walk for about thirty minutes at a time, follow written and oral instructions well, care for a pet, and prepare meals. (*Id.* at PageID.256–57, 258, 260, 261). While Plaintiff's February 27, 2021 Function Report shows some regression in her ability to complete daily tasks, it does not support finding a marked physical limitation as she remained able to walk for up to 25 minutes, prepare meals, albeit on a more limited basis, do laundry, care for her dog, and count change. (*Id.* at PageID.285–87). Notably, while Plaintiff's 2021 function report notes greater limitations, her medical record does not reflect a significant change in her medical circumstances to support such a negative regression.

Based on the explanation included in the ALJ's decision and the underlying medical record, the Court finds that  substantial evidence exists to support the ALJ's determination that Plaintiff does not meet Listing 11.09. (*See id.*; *see also supra* §§ E(1)(a) and (b)). Accordingly, the ALJ's decision must stand as it was decided under

the proper legal standards and is supported by substantial evidence. *Hicks v. Saul*, No. 6:18-214-KKC, 2020 WL 708450, at *3 (E.D. Ky. Feb. 12, 2020).

### b.  The ALJ's Physical and Mental Limitations, as Expressed in the RFC, are Supported by Substantial Evidence

Plaintiff claims the ALJ made an erroneous RFC assessment in finding her capable of a reduced light level exertion by failing to include a sit/stand option and limitations for use of the bilateral upper extremities, and the mental RFC assessment did not appropriately reflect Plaintiff's severe cognitive issues secondary to her MS, post-concussive syndrome, depression, and anxiety.  (*Id.* at PageID.718, 720).

Plaintiff contends the "ALJ failed to review all limitations founded in substantial evidence" which demonstrate she cannot stand for 6 hours of an 8-hour day without a sit/stand option and greater limitations for use of the bilateral upper extremities were warranted.  (ECF No. 8, PageID.718).  First, she highlights the objective evidence of her continuously reported symptoms of numbness and tingling in her hands and into her fingertips and worsening balance problems. (*Id.* at PageID.719).  She explains that "[w]hile neurological examinations were generally unremarkable and MRI remained stable [ . . . ] individuals with MS can experience symptoms without clear imaging and objective findings." (*Id.*).  Plaintiff's statement undercuts her own argument.  The evidence she points to encompasses her complaints regarding her symptoms, which are subjective statements, memorialized in treatment notes which also discuss her MRI test results, objective findings.  The

objective findings do not support Plaintiff's subjective complaints of worsening conditions, but despite this Plaintiff argues the ALJ's findings were not supported by substantial evidence.  This argument is not persuasive as neither the regulation nor the caselaw supports an approach of prioritizing subjective complaints over objective findings.  *Stouffer*, 2012 WL 399727, at *8.

Second, Plaintiff argues that the ALJ's finding that Dr. Aymen's opinion is not supported or persuasive "is an inaccurate evaluation of this opinion evidence." (ECF No. 8, PageID.720).  When assessing a claimant's RFC, an "ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  An ALJ may consider a medical opinion, which is "a statement from a medical source about what [a claimant has] one or more impairment-related limitations or restrictions" in performing physical, mental, sensory, or other demands of work or adapting to environmental conditions.  20 C.F.R. § 404.1513(a)(2).  An ALJ considers the whole medical record and "d[oes] not merely rubber stamp [a physician's] RFC conclusion.  *Chandler*, 667 F.3d 356, 361.

Here, when determining Plaintiff's RFC the ALJ considered "all symptoms and the extent to which the[] symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements

of 20 CFR 404.1529 and SSR 16-3p." (ECF No. 4-1, PageID.35). The ALJ included a detailed synopsis of the medical records, including the objective medical findings and Plaintiff's reported symptoms, along with Dr. Aymen's MSS, and Dr. Mika's report. (*Id.* at PageID.35–42). The ALJ found Dr. Aymen's MSS unpersuasive as it was inconsistent with the medical evidence in the record, and more notably, Dr. Aymen's more recent treatment notes. (*Id.* at PageID.40–41). As the ALJ explained

> While Dr. Aymen is a longtime treatment source with a relevant specialty, this opinion is nearly two years old and appears to have been written during an exacerbation of the claimant's symptoms. Dr. Aymen's more recent treatment notes document normal sensation, unlike the claimant's February 2020 examination; in fact, the claimant's recent physical examinations are typically withing normal limits. In addition, numerous imaging studies since February 2020 have not detected any progression of the claimant's disease process.

(*Id.* at PageID.41). Plaintiff's argument is that the ALJ should have adopted Dr. Aymen's opinion, but the ALJ's decision and the medical record both show that the ALJ considered the medical evidence and reasonably found that Dr. Aymen's opinion was unpersuasive. *Jasmine L.*, 2022 WL 214547, at *8.

Next, Plaintiff contends that despite finding Dr. Kamoo's opinion persuasive the ALJ failed to provide additional limitations in regard to her mental RFC. (ECF No. 8, PageID.720, 722 (citing ECF No. 4-1, PageID.41)). In sum, Dr. Kamoo found

- Plaintiff had difficulty organizing visual information and was easily overwhelmed by too much information being presented at one time.

- Her ability to perform "real-time" auditory processing tasks was impaired, and she was slower in processing auditory information.

- Her ability to organize verbal information into a usable form was limited.

- Her efficiency at learning new information was impaired.

- She would have a mild to moderate impairment with her ability to adhere to basic standards of behavior, along with perform activities within a schedule and maintain regular attendance, be punctual within customary tolerances, and respond appropriately to changes in the work setting.

(ECF No. 8, PageID.721 (citing ECF No. 4-1, PageID.693)).    While Plaintiff summarizes Dr. Kamoo's findings, which the ALJ found persuasive, she does not suggest what additional mental limitations should have been included in the RFC.

The    ALJ    found    that    Plaintiff's    "consultative    examination    and neuropsychological evaluation are consistent with a finding of moderate limitations across 'paragraph B' criteria, and do not preclude the performance of simple and repetitive tasks" "in a low stress environment" while "moderately limited in her ability to interact with the general public." (ECF No. 4-1, PageID.42).  Paragraph B comprises of the following areas of mental functioning: (1) understanding, remembering, or applying information; or (2) interacting with others; or (3)

49

concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. And the ALJ's RFC specifically states that Plaintiff has a finding of moderate limitations across these areas of mental functioning.  What additional limitations are missing?  Absent a more detailed argument from Plaintiff as to what mental limitations are missing, it appears the answer is none.  Thus, based on Dr. Kamoo's report and the ALJ's decision, it appears Plaintiff's mental limitations have been considered by the ALJ and addressed by the RFC.

Between the objective rules of the Social Security Act and its implementation to the applications of those that seek to obtain its benefits lies the ALJ's discretion which is used to analyze, assess, and interpret the record.  The Court's role is not to challenge the ALJ's interpretation when they use their discretion to examine the record and issue a determination as to whether a claimant is disable when the ultimate finding is supported by substantial evidence.  *Cutlip*, 25 F.3d 284, 286.  If the decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Id.*  This is the Court's role is such cases.

The Court finds the ALJ's RFC, both the physical and mental limitations, is supported by substantial evidence.[5]

---

[5] As the Undersigned finds the ALJ's RFC assessment was supported by substantial evidence, it need not address Plaintiff's argument that the VE's testimony was based on an

### 6. Conclusion

For these reasons, I conclude that substantial evidence supports the Commissioner's denial of benefits.    Thus, Plaintiff's motion (ECF No. 8) is **DENIED**,  the Commissioner's motion,(ECF No. 9) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

Date: December 4, 2023                     s/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge

---

inaccurate and/or defective hypothetical and thus cannot be substantial evidence supporting the ALJ's denial of benefits.  (ECF No. 8, PageID.717, 722).